No. 26,113.

J. M. WOOLLEY, *Appellee*, v. J. S. ABLAH et al., Partners, etc., as the
ABLAH MERCANTILE COMPANY, *Appellants*.

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Independent Contractor—Evidence of Relation.* The
proceedings considered in an action for personal injury occasioned by fall
of an elevator in defendants' building where plaintiff was working, and *held,*
the evidence was sufficient to show plaintiff was an independent contractor.

2. SAME—*Liability for Personal Injuries—Special Findings.* A special finding
of fact that the defect in the control device of the elevator, which caused
it to fall, was not apparent to defendants, considered, and *held,* the finding
meant that the defect was not exposed to sight so as to be capable of being
easily seen, and not that the defect was not discoverable to the eye by ex-
ercise of ordinary care.

Appeal from Sedgwick district court, division No. 1; THOMAS E. ELCOCK,
judge. Opinion filed October 10, 1925. Affirmed.

*S. B. Amidon, S. A. Buckland, H. W. Hart* and *Glenn Porter,* all of Wichita,
for the appellants.

*A. L. Noble, W. A. Ayres, Hal M. Black* and *C. A. McCorkle,* all of Wichita,
for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for personal injury
sustained by plaintiff when an elevator fell in defendants' building
where plaintiff was working. Plaintiff sued as an independent con-
tractor. The defense was that he was a servant and defendants' lia-
bility was for compensation; but if plaintiff were an independent
contractor, defendants were not negligent. Plaintiff recovered, and
defendants appeal.

The building was a three-story-and-basement brick building, the
support of which consisted of wooden pillars resting on a dirt foun-
dation, and portions of the building had settled so that all three
stories were affected. Plaintiff was employed to level the structure.
Leveling affected all the floors, and as the work progressed it was
necessary for plaintiff to go from story to story to observe results.
He was told to use the freight elevator, and did so. When going to
the third story to observe its floor the control device of the elevator
did not function, the car went on, struck a beam at the top of the

1. Master and Servant, 26 Cyc. p. 1442.  2. Id., 26 Cyc. p. 1515.

shaft, the cable parted, the dogs failed to arrest descent of the car, and it fell to the bottom.

The building had long been occupied by the grocery company under lease from the owner. J. S. Ablah purchased the building. The grocery company continued as tenant under an unexpired lease which required the tenant to repair, and plaintiff was employed by the company. The negotiations with plaintiff were conducted by J. S. Ablah. To put the building in order required the removal of earth and rubbish from the basement, the laying of a cement floor, the leveling of the building, and after it was leveled a general tightening up. Plaintiff was not equipped to do the earth and cement work, which was let to some one else. He took the job of leveling the building. The subsequent incidental work was not reached.

The terms of the employment were that plaintiff should furnish all necessary tools, appliances and labor. The company was to furnish all material and pay $2.50 per hour for the time consumed in doing the work. The price was fixed under these circumstances: Plaintiff was conducted to the basement, was shown the conditions, was told what was desired, and was asked what he would charge. Plaintiff said he could not tell how long it would take, and the only way he could figure on the job was by the hour. The uncertainty in respect to time resulted from the fact it was impossible to determine in advance the conditions which would be discovered. Some of the factors were: what supports would be found to be decayed when the building was lifted, how much of the old supports could be salvaged, and what new material would be needed. When the building was raised it was found pillars were rotted next to the ground, some more than others. To save material, which, it will be borne in mind, the company was required to provide, plaintiff suggested putting sawed-off old posts on cement footings, and the company furnished cement and sand for that purpose.

Plaintiff brought to the building his jacks, blocks, levels and other appliances, and a laborer whom he employed, entered upon the work, and three days later was injured. The jury returned the following findings:

"1. Did plaintiff and defendants enter into an oral contract with reference to the work to be done? A. Yes.

"2. Did such contract specify the exact work to be done, that is, the number of posts to be rebuilt and the location of each post and the extent of such work? A. No.

"3. If you answer question No. 2 in the negative, state whether or not this was left to be decided by Woolley and the defendants as the work progressed? A. No.

"4. Was any time specified by the contract in which the work was to be completed? A. No.

"5. Did either Woolley or the defendants know, at the time the contract was made, the extent of the work to be done? A. No.

.   .   .   .   .   .   .   .   .   .   .   .

"11. During the time the work was being done, did J. S. Ablah give instructions as to the manner in which the work was to be done, which were followed out? A. No."

The company moved for judgment on the opening statement of counsel for plaintiff, demurred to plaintiff's evidence, requested a peremptory instruction to find for the company, moved to set aside findings 3 and 11, moved for judgment in its favor on the findings, and moved for a new trial. In each instance the ruling was adverse, and each ruling is made the basis of an assignment of error. In final analysis all the assignments relate to the nature of the relation between plaintiff and the company—servant or contractor.

Finding 11 is contrary to Ablah's testimony. Ablah is a wholesale grocer and a manufacturer of extracts and preserves. His testimony would indicate that he was not only in full control of the work plaintiff was employed to do, but directed execution of all the details. It may be he interfered some and talked more, but plaintiff testified as follows:

"Q. Now, when you were down there executing the work, did Mr. Ablah tell you how to do anything; in what way to do it? A. He never told me how to do anything.

"Q. Did you have any talk with him after you started to work? After you made your contract, did you have any talk with him about anything except the material that should be put in? A. No, sir; nothing except material.

"Q. The material for the supports and posts? A. Yes; I talked to him about the material, you know.

"Q. I believe you said he was furnishing the material? A. Yes, sir."

The company makes much of the following question propounded to plaintiff, and the answer:

"When you came to some of the posts, did you call him down about some of the posts—there was a question about which to do? Some of the posts, I understood you, you took out and put in new ones; is that correct? A. Yes."

It will be observed the question was double. That the answer was a response to the second question is shown by what followed:

"Q. Some of them you cut off and put concrete under, and some of them you left in there? A. Yes.

"Q. Now, at the time you went from the basement to other floors, I suppose you talked to Mr. Ablah, or saw Mr. Ablah around there, when the building was jacked up? A. Yes, sir; I saw him.

"Q. Would he be around there with the level, or whatever it was you called it? A. Well, sometimes he was and sometimes he wasn't.

"Q. Well, did you talk to him about that part of the work? A. I talked to him about that right on the start, about what had to be done, you know.

"Q. But as the work progressed, did you talk to him some about it? A. Oh, yes; I would when he come; made complaint to me about this door wouldn't close up above; he come and told me the man could not open his office door; he came down and told me, and I went up and looked at it; told him what had to be done, you know."

As indicated above, the company furnished material for pillar footings which plaintiff suggested. There was some talk about construction of these footings. Plaintiff testified as follows:

"Q. Do you remember Mr. Ablah being down in the basement with a hatchet pounding on some posts down there? A. I do not call it to memory at all.

"Q. He was down there quite a bit, wasn't he? A. Some days, and other days maybe gone all day.

"Q. Well, who furnished the concrete? A. He did.

"Q. Who furnished the sand? A. He did.

"Q. Do you remember of one of the buckets being put in there, or one of the barrels full of concrete being put in, and the question coming up whether you should use five of sand and one of concrete, or three of sand and one of concrete? You remember that instance? A. I remember something about that.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. After you had filled one of these barrels that you were talking about a little while ago, where you knocked the bottom out and used it as a form—that is what you did, wasn't it? A. Yes, sir.

"Q. After you had done that, didn't he come around and ask you what percentage you used of sand and cement? A. I don't think he did, only right on the start.

"Q. Well, that was the start of the work; that was when you started doing the work? A. That wasn't after we put any forms in.

"Q. When was that? Was that the first morning you started in to work? A. I think it was the first day.

"Q. Now, at that time you told him you intended to use or was using five-and-one; wasn't that it, that you thought that was sufficient? A. I think it was four-and-one we used there.

"Q. And Mr. Ablah said he wanted you to use three-and-one; is that correct? A. Don't remember that at all.

"Q. Well, what was the conversation about? A. Well, he asked me what to use, and I told him four-and-one.

"Q. And he went ahead and used four-and-one? A. I used four-and-one."

The result is, finding 11 was sustained by the evidence.

Ablah testified that when he was discussing with plaintiff the subject of pay by the hour, he suggested plaintiff might loaf on the job; whereupon plaintiff said if he did so Ablah could fire him, and if Ablah got too rough plaintiff could quit. Plaintiff did not mention this subject when he narrated the conversation resulting in the contract, and he was asked nothing about it in rebuttal. The court instructed the jury fully with respect to the bearing of privilege to discharge upon the nature of the relation, and the jury may have disregarded the testimony, or may have believed what was said was merely part of the haggling over price. Construing the testimony most favorably to the defendants, it was not decisive.

Question 3 was related to the subject delimited in question 2—number of posts to be rebuilt, location of each post, and extent of such work. The answer to question 3 is that the things specified were not left to be decided upon by plaintiff and Ablah as the work progressed. Some of plaintiff's testimony bearing upon this subject has been presented. He testified further as follows:

"Q. So you didn't know then how long it would take you to do the work? A. I didn't. I didn't know what I was going to find.

"Q. You didn't know at that time in detail just exactly what he wanted done? A. Yes, sir.

"Q. Well, you knew he needed the building jacked up? A. Yes, leveled; yes.

"Q. But you didn't know at that time what posts he wanted to leave in and what take out? A. No, sir; nobody knew that.

"Q. Nobody but him, if he knew it at all? A. Well, I don't know how he would know more than anybody else.

"Q. Well, at that time you could not see down there to see what had to be done, could you? A. No, sir.

"Q. The reason you would not make a contract for the job, because you did not know then just what extent of work he wanted done? Is that true? A. I knew what he wanted done, but I did not know how many timbers would be rotted off or anything about that.

"Q. And you did not know at that time just how he wanted the different parts of that work done? A. He told me he wanted the work done.

"Q. What? A. He wanted it jacked up, and where it needed new timbers we would put them in.

"Q. Now, on that first date you were down there, could you tell, yourself, how many posts had to be taken off, or how many posts were rotted at the bottom, by reason of the darkness? A. Nobody could tell until they were raised up.

"Q. That had to be decided later? A. Sir?

"Q. That had to be decided later, I say; it was left to be decided later? A. It was left for me to decide whether they would hold it up or not."

The result is, finding 3 was well sustained.

It is contended the findings do not disclose a piece of work sufficiently definite to be the subject of an independent contract. In the company's brief it is said:

"The court will note that by plaintiff's own testimony it is not even known at that time by either party what work would have to be done. It is not known how many posts will have to be taken out. It is not known how long the work will take. It is not known or definitely decided how much of the basement will be jacked up nor how many posts taken out, and whether they will be sawed off or new ones put in."

This observation is based on the following testimony of plaintiff:

"Q. Well, now, was there any particular side of the building that he arranged for at that time? A. Well, it is the northwest corner, I think, is where we done the work at, is what he picked out.

"Q. That is where you talked about at that time? A. Yes, sir.

"Q. Was that right in that corner or that part? A. I think it ran along nearly two-thirds of the way across the building, is what we jacked up. He told me when we was over there to go ahead and jack up and find out what we needed and then put in everything we needed.

"Q. You could not tell until you got into the work of jacking what it would take? A. No.

"Q. I suppose this jacking up, would it affect the floors above? A. Well, it would raise the floors above; floors was all out of level all over the building.

"Q. Well, were you to level those floors? A. I was to level as near as I could. The timbers was swayed by age, some of them. When you jacked them up they would not straighten; the timbers had warped.

"Q. That is, you were to level the floors by this jacking process so far as it was practicable to do so? A. Yes; we were to level timbers below; it had some heavy timbers beneath, and get them on the level.

.  .  .  .  .  .  .  .  .  .  .  .  .

"The Court: What did he tell you?

"The Witness: He told me to jack up those low places, and the timbers level, as near as I could do; and some of them was swayed down and would not come level.

"Q. Anything said about using the same timbers? A. Yes.

"Q. We are talking about what was said now? A. What timbers was good, what was good we was to use, and what wasn't good we was to buy new, or decide some way when we got them up; we couldn't tell how rotten they was.

"Q. Whatever new timbers were required, who was to furnish them? A. He was to furnish them.

"Q. You furnished no material? A. No; no material."

The court is of the opinion this testimony, taken in connection with other quoted testimony of plaintiff, shows that the work to

be done was as definite as if the buildings were to be moved to another lot instead of leveled. Throughout the testimony the term "jack up" meant level and then properly support. All the building was to be jacked up which had sunk so as to throw the elevations of the structure out of plane. The building was old, and unskillful raising might occasion more damage than the settling had done. The details of the work consisted of the proper placing and adjusting of instrumentalities for the safe and effective application of force; the application of pressure, under observation of effect throughout the building, until the levels showed all lines to be true; and then the permanent securing of the structure in that position. Plaintiff had no superior in the performance of that work. Whether old pillars should be replaced with new ones, and whether one foot of the decayed ends of usable old pillars should be sawed off, or two feet, were details of material, and not of the conduct of the work of leveling the building and · supporting it as leveled.

As indicated by the quotations, plaintiff was skillfully cross-examined at great length. His testimony is notable for its simplicity and consistency. The instructions given the jury were admirable, not only in statement of the law, but in its application to the issue and the evidence. Measured by the instructions, the evidence was amply sufficient to warrant the jury in finding, as it did, that plaintiff was not a servant, but was an independent contractor.

Plaintiff was injured in July, 1923. The elevator was placed in the building when it was erected, some time in the 1880's. In 1920 the car fell from the third floor to the basement. In January, 1923, the company repaired it, but the proof showed that at the time of the accident it was defective and in bad repair in many respects. One of the defects was an old, rusted break in the flange of the control cable wheel in the pit of the shaft, and there was testimony that the break was such as would allow the control cable to come off the wheel and permit the car to shoot up. In May, 1923, an agent of the then owner endeavored to sell the building to a customer. The younger Ablah took the customer through the building, called attention to defects in it, and said the elevator was in bad shape and needed repair. In April or May, 1923, another agent of the owner endeavored to sell the building to the elder

Woolley v. Ablah.

Ablah. He spoke of the run-down condition of the property, told of the money spent in keeping it up while the company was lessee, and indicated he would not buy because it would require so much money to fix it up. One of the outstanding items which would be expensive was the elevator.

The court instructed the jury that in order to recover it was necessary for plaintiff to prove that the defect causing the accident was brought to the attention of defendants, or that the defect must have been so open and noticeable that an ordinarily prudent person placed in a similar situation should have seen it. In another instruction the court used the expression "would be apparent to a person of ordinary care and observation." The jury returned the following findings:

"6. Was the fall of the elevator caused by a defect or defects of the elevator? A. Yes.

"7. If you answer question No. 6 in the affirmative, state what such defect or defects were. A. Defective control device.

"8. If you answer question No. 6 in the affirmative, was such defect, or were such defects, apparent to: (a) Woolley? A. No. (b) Defendants? A. No.

"9. If you find the defect or defects were apparent to the defendants, state if they know of such defect or defects, and if so, which of said defendants knew of such defect or defects. A. They should have known.

"10. If you find that certain defendants knew of such defect or defects, state when they learned of the same. A. No evidence they knew."

The jury were correct in saying there was no evidence that defendants knew of the defect in the control device, and the liability enforced by the general verdict must be predicated on obligation to know. The jury so understood the case, as the answer to question 9 discloses.

Defendants contend the answer to question 8 canceled question 9, left nothing for the jury to say by way of answer, and what they did say was a volunteered irrelevancy. Having thus disposed of the answer to question 9, defendants contend that finding 8 acquitted them of negligence. The argument is that, as some cited cases hold, the word "apparent" means discoverable by exercise of ordinary care by the person charged with the duty to exercise such care; and because the jury found the defects of the control device were not apparent, the jury found the defects were not discoverable by ordinary care on the part of defendants.

We are not concerned with what meaning the law may attach

to the word "apparent" in a given case. We are concerned merely with what the jury understood the word to mean in the question propounded to them in this case. The usual meaning of "apparent" as applied to the condition of physical objects is, exposed to the sense of sight so as to be capable of being easily seen. The term contains no implication of effort, much less duty, to bring within the range of vision, and there is no reason to believe the jury understood it to mean any more than "open to view." The question applied without distinction to both plaintiff and defendants. Both plaintiff and defendants were about the elevator, rode up and down in the car, and used the car in the movement of articles—plaintiff's tools and appliances, and defendant's freight. Apparent to plaintiff meant visible to his eyes, and apparent to defendants meant visible to their eyes in like situation and in the same sense. To see the defect in the control device required exploration; therefore the defect was not apparent. Correctness of this interpretation is confirmed by the statement inserted by way of answer to question 9. Let it be conceded the statement was volunteered. It is a clear index to the jury's thought. Plaintiff was in no situation to observe. He was not expected to know about things which his use of the elevator did not reveal. The defendants were in a different situation. They were in possession and control and were required to repair by the terms of the lease. Their opportunity for observation extended to what the eye could see concerning the mechanism from the top of the shaft to the bottom of the pit. Therefore, in making a statement by way of response to question 9, the jury applied the instruction relating to defects which an ordinarily prudent person in the same situation would have seen, and said defendants ought to have known.

The defendants assert that the answer to question 9 was contrary to the undisputed evidence. The evidence has been recited. In the court's opinion, it established urgent duty to inspect, and casual inspection would have brought to attention the patent defect in the control device.

There is nothing else in the case of sufficient importance to require the granting of a new trial, and the judgment of the district court is affirmed.